# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| MCI COMMUNICATIONS, INC. and MCIMETRO ACCESS TRANSMISSION SERVICES LLC, | Civil No. 17-1117 (JRT/SER) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| MAVERICK CUTTING AND BREAKING LLC, | |
| Defendant. | |

James J. Proszek, **HALL, ESTILL, HARDWICK, GABLE, GOLDEN, & NELSON, P.C.,** 320 South Boston Avenue, Suite 200, Tulsa, OK 74103, and Seth J. S. Leventhal, **LEVENTHAL PLLC,** 527 Marquette Avenue South, #2100, Minneapolis, MN 55402, for plaintiffs.

Rachel B. Beauchamp, **COUSINEAU, VAN BERGEN, MCNEE & MALONE, P.A.,** 12800 Whitewater Drive, Suite 200, Minnetonka, MN 55353, for defendant.

Plaintiffs MCI Communications Services, Inc. and MCImetro Access Transmission Services, LLC (collectively "MCI") bring an action for trespass, negligence, and statutory liability as an excavator against Maverick Cutting and Breaking LLC ("Maverick"), who severed two of MCI's fiber-optic telecommunications cables while performing concrete saw cutting at an intersection. MCI seeks damages for repair costs and loss of use.

Maverick now moves for summary judgment on all of MCI's claims and on loss-of-use damages. Maverick also seeks to exclude portions of MCI expert Ron Peterson's

testimony, all of MCI expert Peter Tooley's testimony, and evidence of the rental cost of substitute cables.  MCI seeks to exclude Maverick expert Steven Hamilton's testimony.

The Court will grant Maverick's Motion for Summary Judgment in part and deny it in part.  The Court will find that MCI is not entitled to loss of use damages and that no genuine disputes of material fact remain as to trespass or as to negligence based on contractual duties or a saw cutter industry standard of care.  However, the Court will find that a genuine dispute of material fact remains as to whether Maverick was engaged in excavation under Minnesota statute and the common law.  As such, a jury must determine whether Maverick is liable as an excavator under Minnesota statute or in negligence based on an excavator industry standard of care.

The Court will grant Maverick's Motion in Limine in part and deny it in part.  The Court will preclude Peterson's testimony on contract interpretation, what Brooks did when installing the Cables, and saw cutter industry standards of care.  The Court will also preclude Tooley's testimony and evidence of rental cost of substitute cables because both are irrelevant given the Court's ruling on loss-of-use damages.

The Court will grant MCI's Motion in Limine in part and deny it in part.  The Court will preclude Hamilton from testifying as to saw cutter industry standards of care.

## BACKGROUND

## I.    FACTUAL BACKGROUND

In the spring of 2015, the City of St. Paul (the "City") began construction on a public works project (the "Project") to maintain and improve several bridges.

## A.    The Players

Brent Christensen, a civil engineer, was the City's manager of the Project.  (*See* First Aff. of Rachel Beauchamp ("1st Beauchamp Aff.") ¶ 3, Ex. A ("Christensen Aff.") ¶¶ 1-2, 5, July 5, 2018, Docket No. 38.)  The City hired TKDA to design the Project and provide professional engineering services for the Project.  (*Id.* ¶ 6.)  TKDA was responsible for compiling information regarding utilities that might be impacted by the Project and coordinating solutions to identified conflicts.  (1st Beauchamp Aff. ¶ 4, Ex. B ("Quanbeck Aff.") ¶¶ 1, 3.)

Kraemer North America, LLC, ("Kraemer") was the general contractor on the Project.  (1st Beauchamp Aff. ¶ 8, Ex. F ("Rosenberry Dep.") at 14-15.)  Kraemer hired Bolander & Sons ("Bolander") for excavating and demolition, which included pavement removal and grading for new roadway pavements.  (Beauchamp Aff. ¶ 9, Ex. G ("Caroon Dep.") at 8.)

Bolander hired Maverick via oral contract to perform saw cutting for the project.  (*Id.* at 6.)  Bolander told Maverick where to cut and how deep to cut.  (*Id.*)  Maverick performs about 90% of Bolander's concrete saw cutting work.  (*Id.* at 5.)  According to Bolander, Maverick's work involved only saw cutting, did not involve pavement removal or grading, and did not involve excavating.  (*Id.* at 8.)  Maverick asserts that its only job was to cut where Bolander directed and that it did not deal with utilities or their location.  (1st Beauchamp Aff. ¶ 13, Ex. K ("Lewis Dep.") at 4, 11.)

MCI is a telecommunications company that owns and operates underground fiber optic telecommunications cables in and under various streets in the City.  (Compl. ¶¶ 9-10,

Apr. 11, 2017, Docket No. 1.)[1]  MCI owned the Cables that Maverick cut.  Brooks Fiber Communications ("Brooks"), MCI's predecessor-in-interest, originally installed the Cables in 1997 or 1998.  (*See* Decl. of James J. Proszek  ("Proszek Decl.") ¶ 4, Ex. 1 ("As-Builts"), July 26, 2018, Docket No. 48; Proszek Decl. ¶ 5, Ex. 2 ("1st RFA") at 10.)

### B.    The Preparations

On April 26, 2013, TKDA sent a Gopher State One Call ("GSOC") ticket requesting utility maps in the Project area.  (Quanbeck Aff. ¶ 5.)  MCI produced an internal document indicating "Action Taken" in response to TKDA's request related to the intersection of Kellogg and Wabasha (the "Intersection") on May 1, 2013.  (1st Beauchamp Aff. ¶ 5, Ex. C; Proszek Decl. ¶ 10, Ex. 7 at 7-9.)  MCI alleges that it sent "as-builts"[2] of the Intersection but produced no records to show that TKDA received them.  (Proszek Decl. ¶ 10, Ex. 7 at 7-9; *see also* 1st Beauchamp Aff. ¶ 6, Ex. D ("Wilfong Dep.") at 42-43.)  TKDA has no record of receiving anything and the GSOC ticket of utility owner responses shows MCI had not responded as of May 20, 2013.  (Quanbeck Aff. ¶ 6.)

On January 16, 2014, TKDA invited MCI to attend a utility coordination meeting. (*Id.* ¶ 9.)  The invitation referenced the Project area and attached drawings, which showed the Intersection.  (*Id.*)  MCI did not attend the meeting.  (*Id.* ¶ 10.)

---

[1] Counsel has stipulated that MCI and Verizon may be used interchangeably to refer to the plaintiffs in this matter.  (1st Beauchamp Aff. ¶ 1.)

[2] As-builts are "schematic drawings of [a utility's] fiber optic line, where it lies in regard to the surrounding street areas."  (1st Beauchamp Aff. ¶ 11, Ex. I at 3.)

On March 25, 2015, Bolander submitted a GSOC request for a "meet and locate" on March 31, 2015, for "road construction" at the Intersection. (1ˢᵗ Beauchamp Aff. ¶ 10, Ex. H at 3.) The request expired April 14, 2015, at 9:00 a.m. and the duration of the work was listed as 6 months. (*Id*.) MCI locator Vince Johnson performed the meet and locate, marking the approximate horizontal locations of MCI's underground cables. (1ˢᵗ Beauchamp Aff. ¶ 11, Ex. I ("Johnson Dep.") at 8.)

Johnson testified that MCI has as-builts available to internal locators that they can refer to if they "have a question about where the line might possibly run. . . ." (*Id*. at 3-4.) He testified that as-builts might give a depth location or estimate "if the depth features [of the cables] are unusual. . . ." (*Id.* at 3.) But Johnson testified that he typically only consults as-builts when locating in an area with which he is unfamiliar. (*Id.* at 5.) He further testified that the "receiver" used by locators to find the cables can give you a "very, very general idea of depth." (*Id.* at 6.) The depth measurement setting must be separately turned on, but taking such a measurement does not cost anything. (*Id*.) Johnson testified that locators do not usually give depth readings to contractors because they do not want contractors to rely on them. (*Id.*) There is no evidence that Maverick or Bolander asked Johnson for depth information or that Johnson was required to mark depth under Minnesota law. *See* Minn. Stat. § 216D.04, subd. 3 (2018).

MCI asserts that the contracts between the City and Kraemer and between Kraemer and Bolander required that all subcontractors comply with all the requirements of the City's specifications and drawings for the Project. (Proszek Decl. ¶ 12, Ex. 9 at 7; Proszek Decl. ¶ 13, Ex. 10 ¶¶ 2-3; Proszek Decl. ¶ 14, Ex. 11 §§ III(A)-(B), 1507.) MCI notes that the

City's specifications warn that subsurface utility information is of the lowest possible level; thus, information concerning type and location of utilities shown in project drawings are not guaranteed to be accurate or all-inclusive. (Proszek Decl. ¶ 14, Ex. 11 § 1507.)

### C. The Incident

On April 14, 2015, Maverick performed saw cutting for Bolander at the Intersection. (Caroon Dep. at 5.) Maverick saw cut with mechanized equipment over locator marks in the concrete and severed the Cables. (*See id*. at 8; 1st Beauchamp Aff. ¶ 12, Ex. J ("Incident Report") at 1.) The Cables were inside a four inch pipe, the top of which was seven inches down in the 13-inch concrete. (Incident Report at 1-2.) The area Maverick was saw cutting when it severed the Cables consisted of concrete pavement on top of soil. (Proszek Decl. ¶ 8, Ex. 5 at 12.)

Maverick had no knowledge of the Cables, was "there at the sole discretion of [Bolander]," and cut what Bolander told it to cut. (Lewis Dep. at 4.) Maverick had not been in contact with MCI, the City, or Kraemer. (*Id.* at 5.) Maverick never received plans or as-builts related to the Intersection. (*Id.* at 9.) Maverick did nothing to determine the location of the Cables and does not provide any training to its employees as to what precautions they should take regarding underground utilities. (*Id*. at 4, 8, 11.)

### D. The Aftermath

The day after Maverick severed the Cables, a meeting was held with the City, TKDA, Bolander, and representatives of MCI. (Christensen Aff. ¶ 18 & Ex. C.) They discussed cable depth. (*Id.* ¶ 18.) MCI was expected to, and did, mark the rest of its cables

for depth.  (*Id.*)  MCI also had to relocate conflicting cables at its own cost.  (*Id.* ¶ 19; 1st Beauchamp Aff. ¶ 7, Ex. E ("Bonczkowski Dep.") at 9.)

### 1.  Cable Repairs

The Cables were repaired over approximately eight and a half hours.  (1st Beauchamp Aff. ¶ 14, Ex. L ("Damages Calculation") at 1.)  Plaintiffs seek $52,024.68 in damages for the cost of repairing the Cables.  (*Id.* at 5.)

### 2.  Loss-of-Use Damages

While the Cables were being repaired, MCI rerouted traffic to spare capacity in its network on its own established cables.  (Wilfong Dep. at 24-26, 28-29, 33.)  Nevertheless, Plaintiffs seek $859,326.59 in loss of use damages based on how much it **would** have cost to route capacity to a third party and return it back to the network.  (Damages Calculation at 1-5.)  MCI did not pay third parties but rather used "dedicated, spare restoration capacity on other cables in MCI's network which MCI reserves for use in emergencies and does not use in the ordinary course of its business. . . ."  (1st Beauchamp Aff. ¶ 16, Ex. N at 2-3.)

MCI's extra capacity is not located on a separate set of cables but rather on cables that MCI uses in its ordinary course of business, just not to their full capacity.  (2d Aff. of Rachel Beauchamp ¶ 1, Ex. V at 48-49, Aug. 9, 2018, Docket No. 52-1.)  Occasionally, MCI rolls traffic over to this spare capacity when it has to perform a "hot cut," which involves "splic[ing] in another piece of cable to extend the length of [a] cable. . . ."  (*Id.* at 31-32.)  MCI provided damage calculations for the total capacity that the severed Cables were capable of carrying but did not distinguish between "active" and "standby" capacity.

(*Id.* at 58-59.)  MCI has spent "a lot of money to make sure that [its] network is resilient" and to ensure that it has the capacity to move traffic over to other lines in emergencies. (Wilfong Dep. at 51-52.)

### E.    Disputed Facts

#### 1.  Standard Cable Depth

Brent Christensen, manager of the Project, attests that, in his training and experience in civil engineering and project management, he has never experienced telecommunications utilities placed inside poured concrete sections of road pavements. (Christensen Aff. ¶ 21.)  Ronald Quanbeck, a Senior Registered Engineer with TKDA, attested that, in his training and experience, utility lines are expected to be below the pavement.  (Quanbeck Aff. ¶ 14.)  Aaron Rosenberry, a corporate representative of Kraemer North America, testified that Kraemer was surprised to learn about MCI's utility running seven inches down from the top of the roadway through concrete, and that he had never seen that done before in his 32 years of experience.  (Rosenberry Dep. at 7, 48-49.) He also testified that no one had told Kraemer the depth of the Cables.  (*Id*. at 49-50.)  John Caroon, Project Manager and Estimator for Bolander, testified that no one ever provided Bolander with an as-built showing that the cable was located seven inches down within the concrete nor did anyone tell Bolander that there was a cable running directly through the concrete.  (Caroon Dep. at 2, 9.)  He also testified that the industry standard depth for telecommunications cables is 36 inches.  (*Id*. at 10.)  Jamen Lewis, Maverick's 30(b)(6)

representative, testified that Maverick had no knowledge of the cables and performed work at the sole discretion of Bolander, cutting what Bolander directed it to. (Lewis Dep. at 4.)

Vincent Johnson, a Senior MCI Technician, testified that the depth of cables can vary "significantly," but the ideal depth is three to four feet. (Johnson Dep. at 3.) He said that he has encountered cables running less than one foot below ground and through concrete "at least 30 times." (*Id.* at 15.) He has visited approximately 2000 sites per year. (*Id.*) Ron Peterson, MCI's expert witness, agreed that MCI's cables were not placed at a common standard depth or an industry standard depth, stating that 24 or 36 inches are common standards. (1st Beauchamp Aff. ¶ 19, Ex. Q ("Peterson Dep.") at 1, 16.)

Neither the City nor MCI has located a permit or other written authority that would allow MCI's cables to run at seven inches below pavement surface through concrete. (Christensen Aff. ¶ 12; Wilfong Dep. at 48-50; Bonczkowski Dep. at 8-9.) Nevertheless, MCI asserts that cities generally have inspectors overseeing installation and would have ensured that Brooks installed the Cables in a manner consistent with the construction drawings it submitted. (Proszek Decl. ¶ 6, Ex. 3 ("Bonczkowski Decl.") ¶ 7.) As such, MCI argues that the Cables could not have been installed as they were unless the City had approved such an installation. (*Id.* ¶ 8.) Brooks's As-Builts for the Cables show that they were encased in steel, 12 inches down, and encased in concrete. (As-Builts at 3.)

## 2. Possession of the Installation Area

MCI alleges that it had a permit from the City, which gave it undisturbed possession of the area in which it installed the cables that Maverick damaged. (1st Beauchamp Aff.

¶ 17, Ex. O at 8.)   MCI has not found the referenced permit but argues that ample circumstantial evidence supports its existence.  It  alleges that, as part of the installation process, Brooks would have obtained a permit from the city that would have required Brooks to submit proposed construction drawings to the City.  (*See* 1st RFA at 13.)  MCI points to affidavits and depositions by several employees attesting that, based on their experience, "it is highly unlikely" that Brooks could have installed the Cables without getting a permit from the City.  (Proszek Decl. ¶¶ 7-9, Ex. 3 ¶ 5, Ex. 4 ¶ 5, Ex. 5 at 5, Ex. 6 at 10.)  MCI produced a permit and drawings for Brooks' installation of underground cables for another part of the same project.  (Proszek Decl. ¶ 7, Ex. 4 ¶¶ 9-11.)

Christensen attests that the City "is the local authority that provides legal authority for utilities to run and operate their lines underground within the City of St. Paul right-of-way." (Christensen Aff. ¶ 8.)  He attests that, when one of the City's construction projects conflicts with these lines, "the City reserves the right to require those utility owners with conflicting lines to relocate their lines at their own expense."  (*Id.* ¶ 9.)

Stephen Bonczkowski, an MCI employee testifying on behalf of MCI, also testified that the City was the property or right-of-way owner.  (Bonczkowski Dep. at 2, 16.)  He is "the designated individual . . . capable of giving testimony about installation, ownership and maintenance and rights of use of the telecommunications cables" in this case.  (*Id*. at 2.)  Bonczkowski also testified consistently with Christensen that, if the City needed to dig up the street in an area where MCI had cables, MCI would have to move the cables at its own cost.  (*Id.* at 9.)  But Bonczkowski attested that "it is highly unlikely" that Brooks could have installed the Cables without a permit.  (Bonczkowski Decl. ¶ 5.)

## II. EXPERT TESTIMONY

### A. MCI's Expert: Ron Peterson

MCI's proffered Expert, Ron Peterson, gave the following relevant opinions:

4. Maverick was performing excavation activities as defined in Minnesota State Law Chapter 216D. Any point at which the blade moved dirt would constitute excavation under the law. Pictures provided clearly show dirt under the concrete. Because concrete depths vary on sites, there is little doubt that the blade was moving dirt at points during the operation. . . .

6. Maverick should have utilized safe practices to prevent damage to MCI's fiber optic cables. This would include exposing the accurately marked lines by safe and acceptable means prior to crossing the line. This could have easily been accomplished by chipping away the concrete beginning at the edge of the tolerance zone and working toward the marks. This is a commonly used practice to expose utility lines under concrete.

7. Maverick could and should have utilized GPR [Ground Penetrating Radar] to check for obstructions along the proposed path of the saw cut. This is an industry best practice and would have identified the embedment that was the 4" pipe at the base of the concrete. The presence of the marks directly over the location would have been a further indicator that the MCI lines were there. . . .

9. Bolander and Maverick were required to comply with the provisions of the contract between Kraemer and the City as well as the contract between Kraemer and Bolander. These contracts require the contractor and their subcontractors to also follow all laws.

10. Bolander's Project Manager John Caroon, had no understanding of what ASCE 38-02 was and no idea what Quality Level D indicated on the plans and in the contract documents. QL D is the least dependable and least accurate level of subsurface utility depiction on plans. This means that utility locations on plans should not be relied upon and further backs the requirement that utility locations must be verified.

11. Bolander and Maverick either ignored or didn't understand statements on the project plans. In numerous locations, the

plans specify that utility depictions are of a quality level D, that the accuracy of the plans was not guaranteed and that the contractor must verify the exact locations of utility lines.

12. Bolander and Maverick also either ignored or didn't understand the same statements regarding quality level D which can be found in the contract documents.

13. Bolander and Maverick should have been alerted by the presence of the Brooks Manhole Cover and the marks extending from it into the dig location. The fact that no utility lines are shown on the plans at this location should have given clear indication that the MCI fiber optic cables were present and caused them to investigate further prior to cutting the pavement directly across the marks.

14. Regardless of any direction provided by Bolander, Maverick had a responsibility to follow safe practices and industry standards to safely perform their work. . . .

16. Brooks followed industry standards and practices when it placed the fiber optic cables along Kellogg Blvd. When they were forced to place the line in a shallow location, they encased the cables in a steel pipe and surrounded it with concrete. This is a commonly used and accepted practice in the industry.

17. Maverick's cutting technician was cutting unreinforced concrete at the location of the damage. This technician should have known when the saw blade struck the steel pipe. Along with the marks that were present, this should have alerted him to the presence of the pipe. He should have stopped all work, notified Bolander and investigated the issue.

18. I have seen no evidence of a written contract between Bolander and Maverick. A contract would have set forth the responsibilities of both parties for the work being performed and eliminated any gaps in responsibility. The apparent lack of a contract created lapses that contributed to this damage as stated above.

(1st Beauchamp Aff. ¶ 18, Ex. P ("Peterson Report") at 6-9.)

Peterson also testified that it was "[his] feeling that [Maverick] should have received the [project plans], because that's what [he] think[s] a competent subcontractor would do."

(Peterson Dep. at 17.) But Peterson's opinion was based purely on what he would do and on his opinion of the most "competent" or "safe" way to do business as a saw cutter. (*Id.* at 18.) He did not know what percentage of saw cutters in Minnesota – or even across the country – review complete project plans, specifications, and maps before performing each job. (*Id.*) When asked about the number of pages that such documents contained for the Project in question, Peterson acknowledged that "[i]t was huge." (*Id.*)

Peterson acknowledged that he had no expertise in contract interpretation other than the contracts he had been directly involved with and signed. (*Id.* at 19.)

Peterson testified that industry standards of care and industry best practices are both "what's going on, what actually happens in industry, what shouldn't happen in the industry." (*Id.* at 12.) He testified that industry best practices are practices that "all parties agree to be a good practice" and that they must "be prevalent in the industry." (*Id.*) He also testified that industry standards of care "are consistent," but that how they apply "within the laws within the states changes how you comply with the standard." (*Id.* at 11.)

Peterson referenced two publications by the Concrete Sawing and Drilling Association ("CSDA"). (*Id.* at 11-12; 1st Beauchamp Aff. ¶¶ 20-21, Exs. R-S.) Both are entitled "Best Practice." (1st Beauchamp Aff. ¶¶ 20-21, Exs. R-S.) CSDA BP-007 provides "an overview and methodology for scanning concrete with" GPR. (1st Beauchamp Aff. ¶ 20, Ex. R ("BP-007") at 1.) CSDA BP-017 provides "an overview and methodology for properly marking out embedments found with" GPR. (1st Beauchamp Aff. ¶ 21, Ex. S ("BP-017") at 1.) But neither publication specifically asserts that use of GPR is industry standard or best practice, they merely describe how to use it. (*See generally* BP-007; BP-

017.)  Peterson acknowledged that neither BP-007 nor BP-017 states that it is an industry standard or best practice for a saw cutter to use GPR before beginning work.  (Peterson Dep. at 20.)  He also acknowledged that he did not know what percentage of excavators in Minnesota use GPR before asking for concrete saw cutting to be performed.  (*Id.* at 13.)  Furthermore, Peterson testified that he had not talked to any Minnesota saw cutting companies about their understanding of standard practices in Minnesota.  (*Id.* at 15.)

Peterson opined that, based on CSDA F-102, saw cutters should take various actions to locate embedments before cutting.  (*Id.* at 21.)  F-102 provides specifications for flat sawing, (1st Beauchamp Aff. ¶ 22, Ex. T ("F-102") at 1), but Peterson acknowledged that it does not state what he opines, (Peterson Dep. at 21).   He acknowledged that F-102 does not reference GPR as one of the pieces of equipment used by saw cutters and does not say that identifying embedments in concrete is the responsibility of the saw cutter.  (*Id.*)  Indeed, F-102 puts the responsibility of determining whether there are utility lines in or near the cutting area on the owner or contracting agency and states that the owner or contracting agency is responsible for damages that may arise if it directs that an embedment be intentionally cut.  (*Id.* (citing F-102 at 2).)

## B.    Maverick's Expert: Steven M. Hamilton

Maverick's proffered expert, Steven M. Hamilton, is an electrical engineer licensed in Minnesota with over 27 years of experience.  (Decl. of James J. Proszek in Support of Pl.'s MIL ("2d Proszek Decl.") ¶ 3, Ex. 1 ("Hamilton Report") at 3, July 20, 2018, Docket No. 45.)  In his report, he notes that he relies on his experience as a design engineer for the

Green Line light rail project, which required "extensive coordination of utilities" and "resolving utility conflicts. . . ." (*Id.*) He offers the following relevant opinions and conclusions:

1. The fiber optic lines owned and operated by plaintiffs were placed at an unusual depth of 7 inches. Standard minimum depth for such lines would be 36 inches, well below the depth of pavement.

2. The plaintiffs' utility locator was unaware of street-embedded fiber optic cables owned by plaintiffs and made no effort to reveal that information, including:

   a. No effort was made to review plaintiffs as-built plans in his possession.

   b. No effort to utilize the built-in functionality of his locator equipment to estimate depth.

   c. No effort to inspect the manhole for an understanding of the fiber optic cable location or condition.

3. The City of St. Paul was unaware of the pavement-embedded fiber optic cables owned by the plaintiffs.

4. TKDA was unaware of the pavement-embedded fiber optic cables owned by the plaintiffs.

5. Bolander was unaware of the pavement-embedded fiber optic cables owned by the plaintiffs.

6. The plaintiffs had ample opportunity to realize the unusual depth of their fiber optic lines and provide warning or relocate them as necessary.

7. The plaintiffs were invited to the Utility meeting held on January 23, 2014[,] but chose not to attend.

8. The plaintiffs had as-built documentation that listed the depth of the fiber optic cables at 12 inches, but the locators did not refer to those plans since they knew the area well.

9. Per the City of St. Paul code, the plaintiffs would have been obligated to "notify and work closely with the excavation contractor" for installations less than 20 inches below the surface.

10. The plaintiffs' utility locator used equipment that was capable of providing an estimate of depth for their fiber optic cables but chose not to use that function.

11. Bolander was the excavator under contract and did attend utility coordination meetings and specific site meetings with utility owners, including the plaintiffs.

12. Maverick's activities on the day of the incident were consistent with the industry standard of care for saw cutting pavement and do not require independent verification of utilities.

(*Id*. at 6-7.)

Hamilton also opined that Maverick was "not responsible for, or [a participant] of, any utility coordination or locating efforts." (*Id.* at 6.)  He stated that the Project "was most likely awarded to the lowest responsible bidder" so "sub-contractors like Bolander would not plan for, or price their work anticipating chipping away concrete around utility marks to identify exact locations of utilities that would not be expected within the pavement slab" and would not direct Maverick to perform GPR prior to saw cutting.  (*Id.*)  Finally, he observed that "[l]ow bid contract work is expected to follow industry standard of care, not industry best practices."  (*Id.*)

## III. PROCEDURAL BACKGROUND

MCI filed this action on April 11, 2017, alleging trespass, negligence, and statutory liability.  (Compl.)  MCI subsequently sought to add claims for breach of contract against Maverick and to add claims for negligence and breach of contract against Bolander.  (Mot. to Amend Scheduling Order, Apr. 25, 2018, Docket No. 23.)  The Magistrate Judge denied MCI's motion, MCI appealed, and the Court affirmed the Magistrate Judge's decision. (Order, Sept. 24, 2018, Docket No. 57.)

Maverick now seeks summary judgment on loss of use damages and on all of MCI's claims.  (Mot. for Summ. J., July 5, 2018, Docket No. 36.)  Maverick also seeks to exclude portions of MCI expert Ron Peterson's testimony, all of MCI expert Peter Tooley's testimony, and evidence of the rental cost of substitute cables.  (Def.'s MILs, Aug. 31, 2018, Docket No. 54.)  MCI seeks to exclude the expert testimony of Maverick's expert, Steven M. Hamilton.  (Pl.'s MIL, July 20, 2018, Docket No. 43.)

## DISCUSSION

## I.  MOTION FOR SUMMARY JUDGMENT

### A.  Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[T]he court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter."  *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## B.     Loss of Use Damages

Maverick seeks summary judgment on MCI's loss-of-use damages because MCI never incurred any.  The Court will grant Maverick's motion as to this issue because Minnesota law precludes loss-of-use damages under the circumstances of this case.

Minnesota civil jury instructions state that a party may claim damages for "[l]oss of use of the property during the time reasonably and necessarily required [to make the needed repairs to] the property."  Damage to Property—Elements, 4A Minn. Prac., Jury Instr. Guides--Civil CIVJIG 92.10 ("MN CIVJIG") (6th ed.).  Damages are designed to "fairly and adequately compensate" the injured party, who must prove "the nature, extent, duration, and consequences" of the injury.  MN CIVJIG 90.10, 90.15.  The injured party must also mitigate any losses.  MN CIVJIG 92.15; *see also Mullen v. Otter Tail Power Co.*, 153 N.W. 746, 748 (Minn. 1915) ("It was plainly the duty of plaintiff to do all he could to make his loss as small as possible.").

In the present action, MCI claims damages for the amount that it would have cost to reroute MCI's traffic to third-party cables.  But there is no dispute that MCI did not actually reroute traffic to third-party cables; rather, it used spare capacity on its own cables.

Minnesota law allows a party to recover loss-of-use damages.  *Hanson v. Hall*, 279 N.W. 227, 230-31 (Minn. 1938).  The reasonable rental value of substitute property may be used to determine the amount of loss-of-use damages.  *See, e.g., Branch v. Boyer & Gilfillan Motor Co., Inc.*, 142 N.W.2d 727, 728 (Minn. 1966); *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.*, 265 N.W. 2d 655, 662-63 (Minn. 1978).  Minnesota law also allows a party to recover the reasonable rental value of substitute property even though the party

does not rent the substitute property. *See, e.g., id.*; *Jacobs v. Rosemount Dodge-Winnebago South,* 310 N.W.2d 71, 77 (Minn. 1981). Nevertheless, Minnesota law requires a plaintiff to mitigate damages. Thus, a party cannot recover the reasonable rental value of substitute property if the party does not rent such property because it is able to use its own property to mitigate damages. In such a case, a plaintiff does not actually suffer loss of use because it is able to use its own substitute property.

Several cases support this conclusion. In *Barbarossa*, a plaintiff purchased a new truck to replace an old truck for construction work but did not receive it by the time construction season began. 265 N.W. 2d at 657. The plaintiff purchased a different truck several months later. *Id.* The plaintiff was able to complete all of its contracts using the old truck, but the plaintiff sought to recover loss-of-use damages for 48 working hours that it spent repairing the old truck. *Id.* at 658. The trial court awarded the plaintiff $1440 for loss of 48 hours of working time at $30 per hour. *Id.* On appeal, the Minnesota Supreme Court found that that, while the plaintiff had proven loss of use for 48 hours, there was no evidence to support an award of $30 per hour. *Id.* at 662. Instead, the Minnesota Supreme Court awarded $128, which was the rental value of a replacement truck for the hours during which the truck was being repaired. *Id.* at 662-63. Importantly, the plaintiff was only entitled to the rental value for a comparable truck during the 48 hours in which it could prove loss of use, which were the 48 hours in which the old truck was being repaired. *See id.* at 658, 663. The plaintiff was not awarded loss-of-use damages for the hours when the old truck was functioning, even though plaintiff was without the new truck. *See id.*

*Barbarossa* demonstrates the balance between Minnesota's law on loss-of-use and Minnesota's law on mitigation. A plaintiff is only entitled to recover "the damages actually incurred for the loss of use" of property. *Id.* at 662. Fair rental value of a substitute is one way of measuring damages, particularly in cases like *Barbarossa* where rental of a substitute would mitigate lost profits to some extent. But a plaintiff who mitigates damages completely at no cost to himself or herself does not suffer loss-of-use damages.

Likewise, in *Jacobs*, the Minnesota Supreme Court found that plaintiffs were entitled to loss-of-use damages when they were unable to take numerous planned trips as a result of an unsafe and unusable motor home they had purchased from the defendant. 310 N.W.2d at 74, 78. The court sought to compensate plaintiffs, who were unable to fulfill their need "to travel and enjoy their retirement, to take scenic trips before [one plaintiff's] eyesight failed completely, to winter in a warmer climate, to visit their children, and to have confidence that their motorhome was safe and dependable for driving and comfortable and convenient to use as a home while traveling." *Id.* at 79. The court found that the reasonable rental value of a substitute was a fair measure of assessing loss-of-use damages that otherwise may not have an economic value. *Id.* at 78. However, had the plaintiffs mitigated their damages by using a spare motor home they had at home, they would not have suffered these damages and would not be entitled to compensation in the form of the rental value of a substitute.[3]

---

[3] MCI argues that this interpretation of Minnesota law is contrary to Section 928 of the Restatement (Second) of Torts, which allows for loss-of-use damages and which Minnesota cases

*(footnote continued on next page)*

MCI argues that the Court should apply the "spare boat" line of cases and award loss-of-use damages. In *Brooklyn Eastern District Terminal v. United States*, the Supreme Court held that a shipowner may be able to recover loss-of-use damages measured by the reasonable rental value of a substitute boat if it uses its own spare boat that is acquired and maintained in reserve for emergency purposes. 287 U.S. 170, 175-76 (1932). However, if the shipowner uses a substitute boat that is acquired and maintained for use in the general course of business, it is not entitled to loss-of-use damages. *Id.* at 177. MCI argues that its spare capacity is maintained solely for emergencies; thus, it is the equivalent of a spare boat reserved for emergencies.

Courts have applied the spare boat rule to telecommunications cases with varying results.[4] Ultimately, however, the outcome depends on state law. The Court is not aware

---

have adopted, because Comment B of Section 931 states that a plaintiff may recover the rental value of a chattel even if the plaintiff uses his or her own substitute. Restatement (Second) of Torts § 928; § 931, cmt. b. But, while Minnesota cases have explicitly adopted Section 928, they have not explicitly adopted § 931. Indeed, cases citing Section 928 support the conclusion that Minnesota has not adopted Section 931. For example, in *In re Commodore Hotel Fire and Explosion Cases*, the Minnesota Supreme Court cited Section 928 and found that a hotel owner could recover loss-of-use damages in the form of lost revenues to cover fixed unabatable costs incurred during the period the property could not be used. 324 N.W.2d 245, 251 (Minn. 1982). Had the court also intended to adopt Section 931, the plaintiff could have recovered the fair rental value of a substitute hotel during that time and not just the costs incurred.

Furthermore, Comment C of Section 931 appears to qualify Comment B, clarifying that when a plaintiff uses his or her own substitute, the plaintiff is entitled to the reasonable rental value of the substitute used. Restatement (Second) of Torts § 931, cmt. c. Here, MCI has not provided the reasonable rental value of its own spare capacity; rather it calculated damages based on the rental value of third-party capacity, as well as the cost of rerouting the traffic.

[4] Cases allowing telecommunications companies to recover loss-of-use damages in similar circumstances include: *Level 3 Communications, LLC v. Floyd*, 764 F. Supp. 2d 945, 956 (M.D. Tenn. 2011); *Sprint Communications Co., L.P. v. Western Innovations, Inc.*, 618 F. Supp. 2d 1101,

*(footnote continued on next page)*

of any cases applying the spare boat rule to telecommunications disputes under Minnesota law.  The Court finds that the spare boat rule does not allow for damages in this case because Minnesota law requires a plaintiff to mitigate damages, which MCI did.  To allow MCI to recover under the spare boat line of cases would obviate Minnesota's requirement of mitigation.

Even if the spare boat rule could be applied under Minnesota damages law, it would not allow MCI to recover for loss-of-use damages.  While MCI claims that it maintains extra capacity for emergency purposes only, it does not dispute that it has not installed independent, spare cables.  MCI also does not dispute that it uses this spare capacity when it needs to shut down a cable to perform a "hot cut."  As such, MCI's spare capacity is not the equivalent of a spare boat maintained in reserve for emergencies only because it is also used for its own non-emergency business.

Furthermore, a determination of loss-of-use damages based on rental of a substitute would be speculative because a rental market for spare cable capacity does not exist.

Finally, public policy favors this outcome.  As noted by the Supreme Court of Georgia in *CMES*, the "underlying principle of compensatory damages law is not triggered

---

1120 (D. Ariz. 2009), *on reconsideration in part*, No. CV-06-2064-PHX-ROS, 2009 WL 1458467 (D. Ariz. May 21, 2009); and *MCI WorldCom Network Servs., Inc. v. Kramer Tree Specialists Inc.*, No. 02-C-7150, 2003 WL 22139791, at *2 (N.D. Ill. Aug. 15, 2003).

Cases precluding telecommunications companies from recovering loss-of-use damages in similar circumstances include:  *MCI Communications Services v. CMES, Inc.*, 728 S.E.2d 649, 652 (Ga. 2012); *MCI WorldCom Network Servs., Inc. v. Mastec, Inc.*, 544 F.3d 1200, 1201 (11th Cir. 2008) (citing *MCI WorldCom Network Servs., Inc. v. Mastec, Inc.*, 995 So. 2d 221, 229-30 (Fla. 2008)); and *MCI Worldcom Network Servs., Inc. v. OSP Consultants, Inc.*, 78 Fed.App'x 876, 877 (4th Cir. 2003).

here. . . ." 728 S.E. 2d at 652. MCI's spare capacity is a necessary investment to remain competitive in the telecommunications industry. It has "inherent value . . . apart from its value in emergencies, and MCI has not shown that the costs of such infrastructure have not been in some way charged back to its customers by way of, for example, higher rates." *Id*. Allowing MCI to recover loss-of-use damages here would place MCI "in a position significantly better than it would have been without the severance." *Id.* Public policy weighs against awarding loss-of-use damages in these circumstances, because to do so would allow corporations to receive windfalls for losses they never suffered and would compensate them for investments otherwise necessary to make them competitive.

## C.     Trespass

Maverick moves for summary judgment on MCI's trespass claim because MCI did not possess the land at issue and Maverick did not intentionally cut the Cables. The Court will grant Maverick's motion as to this issue.

### 1.  Trespass to Real Property

Under Minnesota law, trespass to real property occurs when the plaintiff has a rightful possession to land and defendant unlawfully enters upon such possession. *Minch Family LLLP v. Buffalo-Red River Watershed Dist.*, 628 F.3d 960, 967 (8th Cir. 2010) (citing *Wendinger v. Forst Farms, Inc.*, 662 N.W.2d 546, 550 (Minn. Ct. App. 2003)).

Maverick argues that MCI cannot show that it possessed the land in which the Cables were buried and that Maverick had the permission of the City, the land's true possessor, to enter upon the land. MCI argues that there is enough circumstantial evidence

to create a genuine dispute of material fact regarding possession of the land in which the Cables were buried.

MCI's evidence of possession is not only circumstantial, it is speculative. Even if a jury could conclude that Brooks had a permit to install the Cables, there is no evidence that would allow a jury to determine the terms of such a permit, including the terms of any depth variance that might have been allowed. Furthermore, the City retained the power to do construction and to force MCI to move its cables. Based on the evidence provided, no reasonable jury could find that MCI possessed the land. As such, the Court will grant Maverick's Motion for Summary Judgment as to MCI's claim for trespass to real property.

### 2. Trespass to Chattels

Trespass to chattels is an intentional tort that occurs when a defendant deliberately dispossesses a plaintiff of chattel. *Herrmann v. Fossum*, 270 N.W.2d 18, 20 (Minn. 1978). "An intentional tort is one in which the actor intends to produce the harm that ensues; it is not enough that he intends to perform the act." Restatement (Second) of Torts § 870, cmt. b (1979). A defendant may be "treated as intending [a] consequence if he knows or believes that the consequence is certain, or substantially certain, to result from his act." *Id.*

Maverick seeks summary judgment on this claim because there is no evidence that it acted intentionally. MCI argues that Maverick cannot defend by saying that it never saw the specifications or drawings because then a party could never be liable for violating the requirements governing its work if it failed to ask or read about them.

A party might be liable in negligence for violating requirements that it failed to ask about or read, but it would not be liable for the **intentional** tort of trespass to chattels.[5]  It is undisputed that encountering MCI's Cables was a surprise to Maverick – as well as to everyone else involved at the Intersection.  Indeed, all the parties involved believed that the cables would be buried in the soil beneath the concrete.  There is no evidence from which a jury could conclude that Maverick knew or believed that severing the Cables was certain or substantially certain to result from its saw cutting.  As such, no reasonable jury could find intent, so the Court will grant Maverick's Motion for Summary Judgment as to MCI's claim for trespass to chattels.

## D.    Negligence

Minnesota law defines negligence as "the failure 'to exercise such care as persons of ordinary prudence usually exercise under such circumstances.'"  *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011) (quoting *Flom v. Flom*, 291 N.W.2d 914, 916 (Minn. 1980)).  To prove negligence, MCI must show:  "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury."  *Id.*

Whether Maverick owed MCI a duty of care is a threshold question.  *Id.*  As a company offering professional services, Maverick is under a duty "to exercise such care,

---

[5] *See Thompson v. Forest*, 614 A.2d 1064, 1067–68 (N.H. 1992) ("[T]he mere knowledge and appreciation of a risk – something short of substantial certainty – is not intent.  The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk is great the conduct may be characterized as reckless or wanton, but **it is not an intentional wrong**.") (quoting W.P. Keeton et al., *Prosser and Keeton on the Law of Torts* § 8, at 36 (5th ed. 1984)).

skill, and diligence as men in [its] profession ordinarily exercise under like circumstances." *Pond Hollow Homeowners Ass'n v. The Ryland Grp., Inc.*, 779 N.W.2d 920, 923 (Minn. Ct. App. 2010) (quoting *City of Eveleth v. Ruble*, 225 N.W.2d 521, 524 (Minn. 1974)). Ordinarily, expert testimony is required to establish the prevailing industry standard of care and the consequences of departure from that standard. *Id.* (citing *City of Eveleth*, 225 N.W. 2d at 525). However, expert testimony may not be necessary when "it is clear without resort to expert opinion" that an error or omission on the part of the professional resulted in damage. *City of Eveleth*, 225 N.W. 2d at 525.

### 1. Contractual Duties

Maverick argues that it cannot be held liable in negligence for failing to comply with the contractual duties set forth in the contracts between the City and Kraemer and Kraemer and Bolander. "When a contract provides the only source of duties between the parties, Minnesota law does not permit the breach of those duties to support a cause of action in negligence." *United States v. Johnson*, 853 F.2d 619, 622 (8th Cir. 1988). Rather, "[t]o prevail in negligence, a plaintiff must prove . . . that the defendant breached 'some duty imposed by law' **not merely one imposed by contract**." *Id.* (quoting *D & A Dev. Co. v. Butler*, 357 N.W.2d 156, 158 (Minn.Ct.App. 1984)). As such, MCI cannot sustain a negligence claim based on Maverick's alleged contractual duties, and the Court will grant Maverick's Motion for Summary Judgment on this issue.

## 2. Industry Standards of Care

Maverick argues that it is entitled to summary judgment on negligence because: (1) evidence regarding excavator industry standards of care are inapplicable to Maverick's work, and (2) there is no evidence from which a jury could determine saw cutter industry standards of care.

Maverick does not dispute that MCI has offered evidence and testimony from which a jury could determine the excavator industry standard of care. The Court will decline to rule as a matter of law that Maverick is not an excavator, as will be discussed below. As such, if the jury determines that Maverick was an excavator, it may consider a claim for negligence based on the excavator industry standard of care.

Nevertheless, MCI has not presented evidence from which a jury could decipher the industry standard of care applicable to a saw cutter. MCI's expert, Peterson, offers several opinions as to industry best practices for saw cutters. But the Court of Appeals of Minnesota has said that industry best practices are not industry standards of care. *Hofmann v. Enterprise Leasing Co. of Minnesota, LLC*, No. A16-0869, 2017 WL 1210123, at *1 (Minn. Ct. App. Apr. 3, 2017), *review denied* (June 20, 2017). Indeed, industry best practices are aspirational, generally requiring a higher standard of care than the industry standard of care. *Id.* at *4 ("[Plaintiff's expert] never establishe[d] that the recommendation [rose] any higher than best practices, or that [it] reach[ed] anywhere near setting the industry standard."). In the present case, Peterson's testimony does not distinguish between industry best practices and industry standards of care, does not reference industry practices or guidelines specific to a saw cutter's duty, and seems to be

based mostly – if not only – on his own view of best practices for saw cutters. This testimony does not establish saw cutter industry standards of care. *See Pond Hollow Homeowners Ass'n*, 779 N.W.2d at 923-24.

For these reasons, the Court will grant summary judgment for Maverick on MCI's negligence claim to the extent that it is based on Maverick's duty as a saw cutter. However, should the jury find that Maverick's work constituted excavation, it may consider negligence based on an excavator industry standard of care.

### E.    Statutory Liability

Minnesota law defines "excavation" as "an activity that moves, removes, or otherwise disturbs the soil by use of a motor, engine, hydraulic or pneumatically powered tool, or machine-powered equipment of any kind, or by explosives." Minn. Stat. § 216D.01, subd. 5 (2018). However, excavation does not include "normal maintenance of roads and streets if the maintenance does not change the original grade and does not involve the road ditch," among other things. *Id.* subd. 5(3).

An "excavator" is someone who "conducts excavation in [Minnesota]." *Id.* subd. 6. An excavator who damages an "underground facility" is liable to the operator of the facility for the cost of necessary repairs. *Id.* subd. 2.

Maverick moves for summary judgment on statutory liability on the grounds that it was not an excavator and was not engaged in excavation. Maverick argues that it only engaged in concrete saw cutting and did not work in the soil, work in the road ditch, or change the road grade. Furthermore, Maverick argues that its work did not "disturb[] the

soil" as that phrase should be interpreted in this statute. Nevertheless, there is evidence to suggest that Maverick set its saw cutter to cut past the depth of the concrete, and it is undisputed that the concrete sat atop dirt.

Both parties argue that the plain and ordinary meaning of the word "disturbs" should guide this action. However, the parties differ as to what result would come of applying such a plain meaning. The Court agrees that the plain meaning of the statute must be applied. *Am. Family Ins. Grp. v. Schroedl*, 616 N.W.2d 273, 277 (Minn. 2000). However, it is a question of fact whether Maverick "disturbed" the soil under the plain meaning of that word, and there are facts supporting either conclusion. As such, there remains a genuine dispute of material fact as to whether Maverick was engaged in excavation, and this question must be resolved by the jury. The Court will thus deny Maverick's Motion for Summary Judgment on MCI's claim for statutory liability.

The Court will grant Maverick's Motion for Summary Judgment as to: (1) loss of use damages; (2) trespass; and (3) negligence based on contractual duties or a saw cutter's industry standard of care. However, a genuine dispute of material fact remains as to whether Maverick was engaged in excavation. As such, the jury must determine whether Maverick is liable as an excavator under Minnesota statute or in negligence based on an excavator's industry standard of care.

## II.    MOTIONS IN LIMINE TO EXCLUDE EXPERT TESTIMONY

### A.    Standard of Review

Under Federal Rule of Evidence 702, expert testimony must satisfy three prerequisites to be admitted:

> First, evidence based on scientific, technical, or other specialized knowledge must be **useful** to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be **qualified** to assist the finder of fact. Third, the proposed evidence must be **reliable or trustworthy** in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (emphasis added) (cleaned up).  The Court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the testimony bears the burden of proving its admissibility.  *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006).

Rule 702 requires that an expert possess "knowledge, skill, experience, training, or education sufficient to assist the trier of fact. . . ."  *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (internal quotations omitted).  But this requirement is "satisfied where expert testimony advances the trier of fact's understanding to **any** degree," and "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."  *Id.* (internal quotations omitted) (emphasis added).  Ultimately, the Court "should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457

F.3d 748, 758 (8th Cir. 2006). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Robinson*, 447 F.3d at 1100 (quoting *Daubert*, 509 U.S. at 595). Nevertheless, overly speculative testimony should not be admitted, and the Court should not admit opinion evidence that is "connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Furthermore, the Court must ensure that a witness's area of competence matches the subject matter of his or her testimony. *Robinson*, 447 F.3d at 1101.

### B.      Maverick's Motion In Limine

Maverick seeks to exclude portions of MCI expert Ron Peterson's testimony, all of MCI expert Peter Tooley's testimony, and all evidence of rental costs for substitute cables. The Court will grant Maverick's Motion in Limine in part and deny it in part. The Court will preclude Peterson from testifying regarding contract interpretation, what Brooks did when installing the Cables, and saw cutter industry standards of care. The Court will also exclude Tooley's testimony as well as evidence of rental value because both are irrelevant given the Court's ruling on loss-of-use damages.

### 1.  Peterson's Testimony

Maverick moves to exclude the portions of Peterson's testimony relating to disputed questions of material fact, legal standards and obligations, contract formation and contract terms, GPR, and excavation industry standards of care.

First, Maverick seeks to preclude Peterson from testifying to disputed facts. An expert may give an opinion "based upon factual assumptions, the validity of which are for the jury to determine;" however, an expert may not testify "that a disputed fact actually occurred or that one witness is more credible than another. . . ." *Thomas v. Barze*, 57 F. Supp. 3d 1040, 1059 (D. Minn. 2014) (quoting *Richman v. Sheahan*, 415 F.Supp.2d 929, 942 (N.D. Ill. 2006)). As such, Peterson may offer statements of fact as the basis for his opinions and conclusions but may not opine on their veracity or on the testifying witnesses' credibility.

Second, Maverick argues that Peterson's testimony that Maverick should have been alerted to the presence of the underground cable while saw cutting has no factual foundation and is based on inconsistent testimony. But Maverick does not argue that Peterson is unqualified to give such an opinion. Furthermore, there are facts in the record that could lead a jury to agree with Peterson's opinion. Peterson may offer this opinion, and any inconsistencies may be explored in cross-examination.

Third, Maverick seeks to exclude Peterson's testimony that Brooks followed industry standards of care when placing cables along Kellogg Boulevard. Peterson has no personal knowledge of what Brooks did or of any alleged permit. As such, he may not testify as to Brooks's actions or as to whether they complied with a permit. Peterson does, however, opine that encasing cables in a steel pipe surrounded with concrete is a commonly used and accepted practice in the industry. Peterson may offer this opinion and may testify as to whether the placement of the Cables appeared to comply with this practice.

Fourth, Maverick seeks to preclude Peterson from offering testimony regarding saw cutter industry standards of care. Because the Court will grant summary judgment for Maverick on MCI's negligence claim based on saw cutter industry standards of care, this testimony is irrelevant and may not be offered.

Fifth, Maverick seeks to exclude Peterson's testimony regarding what Maverick "should have done." Maverick argues that these conclusions should be left to the jury, and that Peterson's testimony should be limited to describing standard practices within the industry. "An expert witness may give opinion testimony if it will assist the trier of fact to understand the evidence or determine a fact in issue. Such opinion testimony is not inadmissible merely because it embraces an ultimate issue to be decided by the trier of fact." *Johnson Grp. v. Beecham, Inc.*, 952 F.2d 1005, 1007 (8th Cir. 1991) (internal citations omitted). As such, Peterson may testify about what Maverick should have done according to standard practices within the industry.

Sixth, Maverick seeks to exclude Peterson's testimony regarding excavation industry standards of care because the testimony rests on the faulty conclusion that Maverick was engaged in excavation. As noted above, it is a question of fact for the jury whether Maverick disturbed the soil. Peterson may thus testify as to excavation industry standards of care, which will be relevant to the negligence claim if the jury finds that Maverick was an excavator.[6]

---

[6] Maverick's expert, Hamilton, may also testify regarding excavation. The Court notes that MCI did not seek to exclude such testimony.

Finally, Maverick argues that Peterson must be prohibited from offering testimony or opinions regarding Maverick's contractual duties. Because Peterson does not purport to be an expert on contract interpretation, and because Maverick is not bound by contracts to which it was not a signatory, Peterson may not testify regarding any contractual duties.

### 2.  Tooley's Testimony and Evidence of Rental Value

Because MCI is not entitled to loss-of-use damages,  neither Tooley's testimony nor evidence of rental value is relevant.  The Court will exclude this evidence.

### C.  MCI's MOTION IN LIMINE

MCI seeks to exclude Hamilton's opinions on:  (1) the depth of the Cables; (2) saw cutter industry standards of care and whether they were followed; (3) Maverick's responsibilities with regard to utility locating; (4) the implications of Bolander being a "low-bid" contractor; and (5) what MCI's locator should have done to determine depth of the Cables.  MCI argues that Hamilton may not offer opinions on these issues because he does not have knowledge, skills, experience, training, or education related to underground utilities, saw cutting, or the industry standards or practices for either of these industries.

The Court will grant MCI's Motion in Limine in part and deny it in part.  The Court will preclude Hamilton from testifying as to the saw cutter industry standards of care but will allow him to testify as to the other opinions contained in his report.

### 1.  Hamilton's Expertise Related to Underground Utilities

MCI argues that Hamilton's only experience related to underground utilities is his work on one project, the Green Line, and that he has never been personally responsible for

locating or relocating existing utility facilities. Furthermore, he has never performed saw cutting in the field and was not aware of what industry standards of care would apply to saw cutting. But Hamilton has expertise in installing underground utilities for the light rail system. (2d Proszek Decl. ¶ 4, Ex. 2 ("Hamilton Dep.") at 15-16.) Hamilton worked on the Green Line for approximately seven years, on the Blue Line for five years, and on a Denver light rail project for approximately four years. (*Id.* at 10.) For the Green Line project, Hamilton was responsible for identifying conflicts with existing utilities and developing standards for the placement of new utilities. (*Id.* at 4, 10.) While Hamilton acknowledged that he was not responsible for developing standards or specifications for how the contractors working on the project were to locate and protect **existing** utilities, he was "aware of the basic procedures that they followed," including utility coordination meetings, working with the GSOC, identifying existing utilities, and relocating them. (*Id.* at 4.) Hamilton was also responsible for identifying conflicts with existing utility facilities in his work for the Blue Line and for the Denver light rail project. (*Id.* at 6, 13.) The Project at issue in this case was similar in scale and process to the Green Line project that Hamilton worked on.

Hamilton has enough experience to testify regarding underground utilities and their location/relocation. However, Hamilton has no experience with saw cutting industry standards of care, and those standards are made irrelevant by the Court's ruling on the negligence claim. As such, Hamilton may offer testimony regarding underground utilities and their location/relocation but may not offer opinions regarding saw cutter industry standards of care.

### 2. Hamilton's Expertise Related to Low Bid Contractors

MCI argues that Hamilton is not an expert with regards to low bid contractors because the only support he provided for his opinion was an article that he reviewed specifically in preparation for the work he had done on this case. (*Id.* at 3.) However, Hamilton also testified that he was previously aware of the distinction between industry standard of care and industry best practice because it was a topic that came up on occasion during his work with the light rail, but he "wanted to find an article that talked about it . . . ." (*Id.*) Hamilton also had personal knowledge of the distinctions between low-bid versus best value projects because he reviewed all contractor bids on the Green Line project. (*Id.* at 31, 33.) Indeed, Hamilton testified that the bulk of the Green Line project was a low-bid project. (*Id.* at 33.)

Hamilton has enough experience to testify regarding low-bid and best-value contracts. He also has enough experience to testify about the distinction between industry standard of care and industry best practice. He may offer testimony on these issues.

### 3. Reliability of Hamilton's Opinions

MCI argues that various opinions offered by Hamilton are unreliable.

First, MCI argues that Hamilton's opinion that Maverick's contract was a "low-bid" contract and was therefore only subject to industry standards of care, not industry best practices, is unreliable because it was equivocal. Any deficiencies in this testimony go to weight, not admissibility, and can be explored on cross examination.

Second, MCI seeks to exclude Hamilton's opinions as to the depth of the Cables, and whether that depth was unusual, as unreliable because the basis for his conclusion was the Minnesota Administrative Code, which Hamilton had not encountered before being hired as an expert. MCI also argues that the code includes language allowing for other depths of placement on a case-by-case basis. But Hamilton has industry experience to support his view that seven inches was an unusual depth. Ultimately, any deficiencies in these opinions go to weight, not admissibility, and may be explored on cross examination.

Finally, MCI argues that Hamilton's opinion that MCI would have been obligated to notify and work closely with Bolander or Maverick per City code because the Cables were less than twenty inches deep is unreliable because Hamilton was not personally aware of this requirement before being hired as an expert. Again, these deficiencies go to weight, not admissibility, and can be addressed by cross-examination.

### 4. Usefulness of Hamilton's Opinions/Province of the Jury

MCI also argues that most of the opinions and conclusions that Hamilton sets forth in his report are simply statements of fact based on his review of various documents and that such testimony is not helpful to the jury. Hamilton may offer statements of fact to explain the basis of his opinions but may not testify to the veracity of disputed facts or the veracity of witnesses. *See Barze*, 57 F. Supp. 3d at 1059.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant's Motion for Summary Judgment [Docket No. 36] is **GRANTED IN PART and DENIED IN PART as described herein.**

2.      Plaintiffs' Motion to Exclude Expert Testimony of Steven M. Hamilton [Docket No. 43] is **GRANTED IN PART and DENIED IN PART as described herein.**

3.      Defendant's Motion to Exclude Expert Testimony and Rental Cost Documentation [Docket No. 54] is **GRANTED IN PART and DENIED IN PART as described herein.**

DATED:  March 12, 2019                                    _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                                        JOHN R. TUNHEIM
                                                                        Chief Judge
                                                              United States District Court